UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMUEL MICHAEL ROSIER,

       Petitioner,

                                    CASE NO. 12-14139
v.                                    HONORABLE NANCY G. EDMUNDS

STEVE RIVARD,

       Respondent.

_____/

## OPINION AND ORDER DENYING THE HABEAS PETITION, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

This matter has come before the Court on petitioner Samuel Michael Rosier's amended habeas corpus petition under 28 U.S.C. § 2254. The petition challenges Petitioner's state conviction and life sentence for first-degree criminal sexual conduct. *See* Mich. Comp. Laws § 750.520b(1)(a) (sexual penetration of a person under the age of thirteen). The amended petition raises nine claims regarding the trial court's evidentiary rulings, the prosecutor's remarks, Petitioner's trial and appellate attorneys, the cumulative effect of errors, and Petitioner's sentence.

The State urges the Court to deny the petition because Petitioner's claims are procedurally defaulted or are not cognizable on habeas review and because the state-court decisions were not objectively unreasonable. The Court agrees that Petitioner's claims do not warrant habeas relief. Accordingly, the petition will be denied.

# I.  Background

## A.  The Trial

Petitioner was charged with first-degree criminal sexual conduct in Wayne County, Michigan.  He was tried before a jury in Wayne County Circuit Court.

### 1.  The "Other Acts" Witness

The first witness was the "other acts" witness ("N.M."), who was twenty-seven years old at trial.  She testified that, in 1993 when she was ten years old, she was living with her grandparents in Battle Creek, Michigan.  Petitioner was their neighbor at the time, and she first met him one day after school when none of the adults in her household were home to let her inside.  She asked Petitioner, who was standing in front of his house, whether she could use his phone.  Petitioner permitted her to use his phone, and she remained in his house while she waited for her relatives to return home.  When her relatives arrived home, Petitioner went outside with her and talked with her grandmother.  They made plans for Petitioner to teach her karate.

On a subsequent day, she went back to Petitioner's house with her grandmother's permission to learn karate from Petitioner.  As she practiced her karate kicks and how to say a particular word while executing the kicks, Petitioner went to another room and changed into something that looked like an after-shower garment.  He returned and suggested a different technique to help her with the karate kicks.  He then blindfolded her with a tie, asked her to lie down, and told her to inhale and exhale as he straddled her.  There were six counts of inhaling and exhaling.  On the third count, Petitioner placed his penis in her mouth, and on the sixth count, he withdrew his penis.  Then, he moved to a corner and pulled out a plastic toy.  He removed the tie

from her face and showed her the block that he supposedly put in her mouth. She did not believe he had put the block in her mouth because she had been able to observe him from underneath the blindfold as she was lying on the floor. She was surprised and upset by what had happened, but she tried to mask her feelings because the incident was so unexpected and she did not understand it at the time. As she left the house, Petitioner said, "This is our little secret." She later told her grandmother what had happened, and the police were contacted. Petitioner was later convicted for what he had done to her. (10/5/10 Trial Tr., at 23-44.)

### 2. The Complainant, her Brother and Mother, and the Motion for a Mistrial

The complainant was six years old at trial. She testified about a day when she visited a nearby house where Miss Emma and a man lived. As she was picking up the toys, the man put a thing over her eyes and put his "private" in her mouth. She was standing in front of him at the time, and he was wearing a shirt, but no pants. The man subsequently took the thing off her eyes and said, "Good girl." There were no other children in the house at the time. She then ran outside and told her friend Tranese and her brother D.J. that Sam had put his private in her mouth. The next day she told her mother that Sam had put his private in her mouth. Her mother then got a knife, but her daddy took the knife from her mother, and the police came to the house. *Id.*, at 51-60, 73-77, 85-86. The complainant identified Petitioner at trial as "Sam," *id.*, at 60, and she explained that a man's "private" is what he uses to "pee." *Id.*, at 86.

The complainant's brother was seven years old at Petitioner's trial. He testified that Sam and Emma and their children lived next door to him on Loretto Street in Detroit. One day in June, he was playing outside with his friend when the complainant

came out of the neighbor's house and told him that Sam had put his private in her mouth.  He did not believe the complainant at the time, but he later told his mother what the complainant had said.  *Id.*, at 91-95.

The complainant's mother testified on direct examination that she and her family lived directly next door to Emma and Sam, and on June 19, 2010, the complainant told her something that made her cry.  She then got a knife with the intention of cutting off Sam's penis, but her fiancé took the knife from her.  She later talked to Emma, and someone notified the police.  *Id.*, at 110-117.

On cross-examination, defense counsel asked the complainant's mother what the complainant's exact words to her had been.  The mother responded that she and the complainant had been watching the movie "Lovely Bones" when the complainant informed her that she liked the movie.  She then explained the movie to the complainant and advised her to tell an adult if anyone ever touched her inappropriately.  After she informed the complainant that some people do bad things to children, the complainant said, "Like Sam," and when she asked for clarification, the complainant told her that Sam had put his private in her mouth.  *Id.*, at 117-19.

On re-direct examination, the mother testified that the movie was about a young girl who is kidnaped and buried and that an adult watching the movie would understand that the girl had been raped and murdered.  The mother also testified that the movie did not depict nudity, sex acts, or anything comparable to what the complainant had described to her.  The mother further testified that there was no pornography in her home and that the complainant would not have witnessed an act of oral sex.  *Id.*, at 119-22.

A portion of the movie "Lovely Bones" was subsequently played for the jury, and the mother confirmed that it was the movie she and the complainant had been watching on the day when the complainant disclosed Petitioner's act of oral sex on her. *Id.*, at 134-38. On re-cross examination, defense counsel elicited the mother's testimony that it was immediately after the movie that the complainant disclosed the abuse. *Id.*, at 139-40.

The remainder of the movie was played for the jury on the next day of trial. At the conclusion of the movie, defense counsel moved for a mistrial on grounds that the movie was emotionally charged, it depicted a serial killer, and it had elements of similar acts. Defense counsel argued that the jury would be unable to give Petitioner a fair trial as a result of seeing the movie. Defense counsel declined the trial court's offer to give a curative jury instruction because he did not think the jurors could completely disregard what they had seen and give Petitioner "a fair shake." (10/6/10 Trial Tr., at 4-6.)

The trial court denied the motion for a mistrial. The court pointed out that when there were additional questions about the movie, the court thought that the jury should see the movie for itself and make an independent determination about its possible suggestiveness. The court, nevertheless, offered to work with defense counsel on a curative instruction. *Id.*, at 6-8.

### 3. The Defense and Verdict

Petitioner did not testify, and the only defense witness was Emma Jean Barnes, who testified that she lived with Petitioner and her children on Loretto Street. She stated that the complainant's mother was her neighbor and that her children played with the neighbor's children. She stated that, on many occasions, the children next door

wanted to come to her house to play in the yard with her children's toys, and although there were times when she did not want them to come over, that did not cause any friction between her and her neighbor. Barnes also stated that the complainant's mother had never shown any anger toward her, that their children still played together, and that she was comfortable having Petitioner around her children, including her six-year-old daughter. *Id.*, at 11-16.

Defense counsel urged the jury to keep an open mind. He argued that no investigation of the charge had been done, that there was no physical evidence, and that the prosecution was relying on the words of a five-year-old. Defense counsel also pointed out that the "other acts" incident occurred seventeen years earlier, and he maintained that the related testimony was more of a distraction than anything else. *Id.*, at 31-35.

On October 6, the jury found Petitioner guilty as charged. *Id.*, at 50. The trial court sentenced Petitioner to mandatory life imprisonment without the possibility of parole under Mich. Comp. Laws § 750.520b(2)(c), because it was Petitioner's second conviction for criminal sexual conduct involving someone under the age of thirteen.

## B. The Appeals and Habeas Petitions

Petitioner raised his first six habeas claims in the Michigan Court of Appeals on direct review. The Court of Appeals affirmed Petitioner's convictions and sentence in an unpublished, *per curiam* decision. *See People v. Rosier*, No. 301493 (Mich. Ct. App. Feb. 16, 2012). Petitioner raised the same six claims and two additional claims in the Michigan Supreme Court. On September 4, 2012, the Michigan Supreme Court denied

leave to appeal because it was not persuaded to review the issues. *See People v. Rosier*, 492 Mich. 866; 819 N.W.2d 863 (2012) (table).[1]

Petitioner commenced this action on September 18, 2012. After the State filed an answer to the petition, Petitioner moved to hold his petition in abeyance while he returned to state court to pursue additional state remedies. The Court granted Petitioner's motion and closed this case for administrative purposes.

Petitioner then filed a motion for relief from judgment in the state trial court. He alleged that he was denied due process and a fair trial, that trial counsel was ineffective for failing to request a bill of particulars, and that appellate counsel was ineffective for failing to raise meritorious issues on direct appeal. The trial court denied Petitioner's motion on the merits. The Michigan Court of Appeals, however, denied leave to appeal because Petitioner had failed to establish "good cause" under Michigan Court Rule 6.508(D)(3)(a) for not raising the issues previously. *See People v. Rosier*, No. 322803 (Mich. Ct. App. Oct. 1, 2014). The Michigan Supreme Court denied leave to appeal for failure to establish entitlement to relief under Rule 6.508(D). *See People v. Rosier*, 498 Mich. 871; 868 N.W.2d 618 (2015).

On October 13, 2015, Petitioner filed an amended habeas petition and a motion to re-open this case. The Court granted Petitioner's motion, and the State subsequently filed a supplemental answer.

## II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' to

---

[1]  Justice Michael F. Cavanagh voted to grant leave to appeal.

show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (quoting 28 U.S.C. § 2254(d)). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*, at 103.

### III.  Discussion

### A.  The Movie

Petitioner claims the trial court deprived him of his constitutional rights when the court permitted the prosecutor to show the movie "Lovely Bones" to the jury and then

denied Petitioner's motion for a mistrial after the jury viewed the movie.[2]  Petitioner argues that the movie was highly prejudicial, it was not probative of any fact at issue, and it was irrelevant because he did not advance the theory that the movie influenced the complainant to make false accusations about him.

The Michigan Court of Appeals agreed with Petitioner that the trial court abused its discretion in admitting the film as evidence.  The Court of Appeals stated that the evidence was relevant under Michigan Court Rule 401, but that it was inadmissible under Michigan Court Rule 403, because the danger of unfair prejudice substantially outweighed any probative value of the film.  In reaching this conclusion, the Court of Appeals pointed out that, because the film's themes pertained to repeated predatory behavior toward neighborhood children, there was a danger the jurors would convict Petitioner to protect other children from future harm.   The Court of Appeals nevertheless concluded that Petitioner was not entitled to relief because the error was not outcome determinative.

Although Petitioner claims that the trial court's denial of his motion for a mistrial violated his constitutional rights to due process of law, a fair trial, and an impartial jury, his claim is essentially an evidentiary one, and the contention that the movie was

---

[2]  According to the Michigan Court of Appeals,

> [t]he film is primarily about a man who preys on children in his neighborhood and about parents coping with the murder of their young daughter at his hands.  Although it is never expressly stated that the daughter was sexually assaulted prior to her murder, it is implied.  Further, one of the many murder victims of the man in the film was a six year old girl, which was similar to the age of the victim defendant was accused of assaulting.  The film is emotional and suspenseful, and includes scenes in which children are shown in grave peril.

*Rosier*, 2012 WL 516068, at *3.

inadmissible under the Michigan Rules of Evidence is not a cognizable claim on federal habeas review. *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "If a ruling is especially egregious and 'results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief,' " but "states have wide latitude with regard to evidentiary matters under the Due Process Clause." *Wilson v. Sheldon*, 874 F.3d 470, 475-76 (6th Cir. 2017).

The movie in question here became relevant when the complainant's mother testified that, after she and the complainant watched the movie, the complainant disclosed what Petitioner had done to her. The movie was shown to the jury to dispel any notion that the movie influenced the young complainant to accuse Petitioner of putting his penis in her mouth. The prosecutor explained the purpose of the movie to the jury in his closing argument, and he even described the movie as "a very insignificant piece of evidence." (10/6/10 Trial Tr., at 23.)

The trial court's decision to show the movie was not egregious, and it did not result in the denial of fundamental fairness because the court instructed the jury that the movie had absolutely no relationship to the charge against Petitioner, that it was not a sociological study, and that the jurors should not consider it as such. The court explained that "[t]he sole purpose for which it was allowed was to provide [the jurors] with an independent basis to determine whether the viewing of the film . . . may have had any undue influence on [the complainant] or her mother . . . in making the

allegations against [Petitioner]." The court repeated: "That is the only purpose for which you as Jurors may consider the content of the film." (10/6/10 Trial Tr., at 45.)

As the Michigan Court of Appeals subsequently recognized:

> [t]here is no reason to believe that the jury's verdict was the product of prejudice created by viewing the film. Rather, considering all of the evidence in the case, it is certain that the jury concluded that the victim's testimony was credible and that she was truthfully describing actions that defendant committed.

*Rosier*, 2012 WL 516068, at *4.

The Michigan Court of Appeals reasonably concluded from all the evidence in the case that the result of the trial would not have been any different had the film been excluded. Thus, Petitioner's constitutional right to due process was not violated, and habeas relief is not warranted on his claim.

## B. "Other Acts" Evidence

Petitioner claims next that the trial court erred by allowing the prosecutor to admit evidence of his prior conviction for first-degree criminal sexual conduct involving a girl under the age of thirteen. The evidence was admitted through N.M. who testified that, when she was ten years old, Petitioner covered her eyes, put his penis in her mouth, and subsequently was convicted for what he did to her. Petitioner contends that this testimony was far more prejudicial than probative and so emotional that it served to divert the jury's attention.

### 1. Background

The prosecutor moved to admit the evidence on the first day of trial, claiming that the evidence was admissible under Mich. Comp. Laws § 768.27a[3] and Michigan Rule of

---

[3] Section 768.27a reads in relevant part as follows:

Evidence 404(b)[4] because it was relevant and proved that Petitioner's conduct involved a common scheme or plan.  (10/4/10 Trial Tr., at 3-7.)  Defense counsel admitted that the two incidents of criminal sexual conduct were "eerily similar," but he maintained that the probative value of the anticipated testimony was outweighed by the danger of unfair prejudice.  *Id.*, at 6.  The trial court granted the prosecution's motion to admit the evidence, stating that, in the prior case, Petitioner

> covered the eyes of a ten year old girl and placed his penis in her mouth.  The girl was a neighbor and [the] act was done in isolation.  He was bound

---

Sec. 27a. (1) Notwithstanding [Mich. Comp. Laws § 768.27], in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant . . . .

(2) As used in this section:

(a) "Listed offense" means that term as defined in section 2 of the sex offenders registration act, 1994 PA 295, MCL 28.722.

(b) "Minor" means an individual less than 18 years of age.

Mich. Comp. Laws § 768.27a.

[4] Rule 404(b) reads:

**(b) Crimes, Wrongs, or Other Acts.**

**(1)** *Prohibited Uses.*  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

**(2)** *Permitted Uses.*  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or                    lack                    of                    accident.

Mich. R. Evid. 404(b).

over in [the current] case on allegations that he placed a cover of some sort over the eyes of [the] five year old [complainant] and then placed his penis in her mouth. Again we have a neighbor and an act being done in isolation.

*Id.*, at 10.

The trial court concluded that the similarities between the two cases suggested a common scheme, plan, or system of doing an act, and, therefore, the anticipated testimony from N.M. fell within the type of evidence admissible under Rule 404(b). The court also determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *Id.*, at 7-15.

After N.M. testified on direct examination by the prosecutor, defense counsel objected on the ground that the prosecutor had gone into a lot of detail with N.M. about what occurred before the actual sexual penetration. The prosecutor maintained that the details were necessary to show how Petitioner had "groomed" his victim by getting to know her relatives and gaining their sense of trust. The prosecutor argued that this was similar to what Petitioner did in the case for which he was on trial. (10/5/10 Trial Tr., at 45-46.)

The trial court stood by its prior ruling – that the evidence was admissible – on the basis that the building of trust could be part of a plan or scheme under Rule 404(b). The court, nevertheless, stated that if N.M.'s testimony proved to be dissimilar to other testimony that developed in the case, the court would allow defense counsel to renew his motion and the court would then strike the disputed portion of N.M.'s testimony or give a limiting jury instruction. *Id.* at 46-47.

N.M.'s testimony did not prove to be dissimilar to other testimony in the case, and on direct appeal, the Michigan Court of Appeals concluded that the trial court did not err

by admitting evidence of Petitioner's prior "bad acts." The Court of Appeals agreed with the trial court that the evidence was admissible under Mich. Comp. Laws § 768.27a and that the danger of unfair prejudice did not outweigh the probative value of the evidence.

### 2. Analysis

This Court finds no merit in Petitioner's claim because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *McGuire*, 502 U.S. at 67–68. Furthermore, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Although "the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L.Ed.2d 574 (1997); *Huddleston v. United States*, 485 U.S. 681, 108 S. Ct. 1496, 99 L.Ed.2d 771 (1988), it has not explicitly addressed the issue in constitutional terms." *Id.*, at 513. Therefore, the state trial court's decision to admit "other acts" evidence, and the state appellate court's rejection of Petitioner's claim, were not contrary to, or an unreasonable application of, any Supreme Court decision under § 2254(d)(1).

Even if Petitioner's claim were cognizable on habeas review, it was not fundamentally unfair to admit the evidence for the reasons given by the state courts. The evidence was admissible under Mich. Comp. Laws § 768.27a, and, in the words of the Michigan Court of Appeals,

> the two assaults [were] similar enough to make the previous bad act relevant. The prior victim and the victim were young neighbor girls and they had both been over to defendant's house on previous occasions before the assaults. Defendant isolated the girls, obstructed their vision,

and without force, put his penis in their mouths. The prosecution, by questioning the first victim about the nature of her relationship with defendant and the manner in which he elicited her trust, was able to show the extent of the similarities between defendant's alleged sexual assaults. Therefore, the level of detail was not excessive to the point of irrelevance.

*Rosier*, 2012 WL 516068, at *1.

To conclude, Petitioner's claim is not cognizable on habeas review, and even if it were, the evidence was admissible under state law, and the state appellate court's adjudication of the claim on the merits was objectively reasonable. Habeas relief is not warranted.

## C. The Prosecutor

Petitioner alleges that the prosecutor's remarks during opening statements and closing arguments deprived him of due process. The Michigan Court of Appeals reviewed this claim for "plain error affecting substantial rights" because Petitioner did not object to the prosecutor's remarks at trial. The State argues on the basis of Petitioner's failure to make a contemporaneous objection that Petitioner's claim is procedurally defaulted.

A procedural default in the habeas context is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). Under the doctrine of procedural default, "a federal court will not review the merits of [a state prisoner's] claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). In this Circuit,

"[a] habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met: (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for

denying review of a federal constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default." [*Jalowiec v. Bradshaw*, 657 F.3d 293, 302 (6th Cir. 2011)]. To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court decision disposing of the claim." *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc).

*Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013).

### 1. Procedural Default Factors One, Two, and Three

The state procedural rule in question here is Michigan's contemporaneous-objection rule. This rule requires defendants in criminal cases to preserve their appellate claims by objecting on the same ground in the trial court. *See People v. Buie*, 298 Mich. App. 50, 70-71; 825 N.W.2d 361, 374 (2012). Petitioner did not object to the prosecutor's disputed remarks. Therefore, the first element of procedural default is satisfied.

As noted above, the Michigan Court of Appeals reviewed Petitioner's claims for "plain error affecting substantial rights." *Rosier*, 2012 WL516068, at *4. A state appellate court's review for "plain error" constitutes enforcement of a state procedural rule, *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001), and even though the Michigan Court of Appeals also addressed Petitioner's claims in alternative holdings, this "does not require [the Court] to disregard the state court's finding of procedural bar." *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998). As explained in *Harris v. Reed*, 489 U.S. 255 (1989),

> a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. See *Fox Film Corp. v. Muller*, 296 U.S. 207, 210, 56 S.Ct. 183, 184, 80 L. Ed. 158 (1935). Thus, by applying this doctrine to habeas cases, [*Wainwright v. Sykes*, 433 U.S. 72 (1977)]

> curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision. In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.

*Id.* at 264 n.10 (emphasis in original). The second procedural-default factor is satisfied.

The third factor is satisfied if the state procedural rule in question is an adequate and independent state ground for denying review of a federal constitutional claim. "The adequacy of a state procedural bar turns on whether it is firmly established and regularly followed; a state rule is independent if the state court actually relies on it to preclude a merits review." *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005) (citing *Abela v. Martin*, 380 F.3d 915, 921 (6th Cir. 2004)).

"Michigan's contemporaneous-objection rule is both a well-established and normally enforced procedural rule," *Taylor v. McKee*, 649 F.3d 446, 451 (6th Cir. 2011), and the Michigan Court of Appeals relied on the rule to preclude full review of Petitioner's prosecutorial-misconduct claim. The third procedural-default factor is satisfied.

### 2. The Fourth Factor

The fourth factor requires a habeas petitioner to show "cause" for his state procedural error and resulting prejudice. Petitioner argues that his trial attorney should have objected to the prosecutor's comments. To determine whether trial counsel was ineffective for failing to make an objection, the Court looks to Petitioner's underlying claims about the prosecutor's remarks.

### a. The Opening Statement

### i. Quoting the Complainant

The prosecutor began his opening statement by quoting the complainant's words to her mother: "Mom, Sam put his private in my mouth." (10/5/10 Trial Tr., at 16.) Although Petitioner contends that this remark was a deliberate interjection of inadmissible hearsay, the complainant subsequently testified that she told her mother that Sam put his private in her mouth. (10/5/10 Trial Tr., at 59.) The complainant's mother and brother also testified that the complainant said, "Sam put his private in my mouth." *Id.* at 93, 119. The alleged error was harmless because the remark eventually was introduced in evidence. In addition, the trial court instructed the jurors that the attorneys' opening remarks were not evidence and that they were only meant to help the jurors understand how each side viewed the case. (10/5/12 Trial Tr., at 12.) Defense counsel was not ineffective for failing to object to the remark.

### ii. Comment on the "Other Acts" Evidence

Petitioner contends that the prosecutor mis-characterized N.M.'s proposed testimony by stressing similarities between N.M.'s case and the case for which he was on trial. According to Petitioner, the similarities did not exist, and the prosecutor misled the jury by suggesting otherwise.

Petitioner claims that the prosecutor was mistaken when he said that Petitioner babysat N.M., that she went to his house to play with his children and their toys, and that a piece of fabric was used to cover her eyes. These were minor errors. Further, even defense counsel admitted that the two cases were "eerily similar," and the trial court maintained that the "other acts" evidence was admissible. The trial court also told

the jury that the attorneys' opening statements were not evidence and that they were meant to help the jurors understand how each side viewed the case. *Id.*

Under the circumstances, defense counsel was not ineffective for failing to object to the prosecutor's comparison of the two crimes. An objection would have been futile, and "the failure to make futile objections does not constitute ineffective assistance." *Altman v. Winn*, 644 Fed. App'x 637, 644 (6th Cir.), *cert. denied sub nom. Altman v. Brewer*, 137 S. Ct. 76 (2016).

### b. Closing Argument

Petitioner alleges that, during closing arguments, the prosecutor interjected his personal opinion of Petitioner's guilt, vouched for prosecution witnesses, and argued facts not in evidence.

### i. Personal Opinion

The prosecutor began his closing argument by saying:

> The Defendant sees kids differently than the rest of us do. The Defendant in this case has sexual urges towards children that he chooses not to control.

(10/6/10 Trial Tr., at 17.)

These comments did imply that Petitioner was guilty. But the prosecutor immediately reminded the jurors that they had taken an oath to put aside sympathy and any prejudice that they might have and to return a true and just verdict based on the evidence they had heard. *Id.* Following those remarks, the prosecutor explained the elements of the crime to the jury and pointed out that it was up to the jury to determine whether he had proved the elements of the crime beyond a reasonable doubt. *Id.* at 18-19. The trial court, moreover, informed the jurors that the attorneys' closing arguments

were not evidence and that the jurors should base their verdict only on the evidence, which consisted of the witnesses' testimony, the exhibits, and anything else the court said was  evidence.  (10/5/10 Trial Tr., at 13; 10/6/10 Trial Tr., at 40-41.)

Because jurors are presumed to follow a court's jury instructions, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001), the trial court's jury instructions likely diffused any prejudice caused by the prosecutor's brief remarks about Petitioner being different and unable to control his sexual urges. Therefore, even if defense counsel's failure to object to the remarks amounted to deficient performance, the deficient performance did not prejudice the defense.

### ii.  Vouching

Petitioner asserts that the prosecutor vouched for the complainant and N.M. by comparing their memories and maturity to show that they were good witnesses. Improper vouching occurs when a prosecutor indicates a personal belief in a witness's credibility or implies that he or she has special knowledge of facts not before the jury. *United States v. Garcia*, 758 F.3d 714, 723 (6th Cir. 2014) (citing *United States v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004)).

Here, the prosecutor described the complainant's memory as "awfully darn good for a child so small."  But he also pointed out that the complainant's memory was incomplete, that she could be expected to make mistakes, and that her prior testimony was inconsistent with her trial testimony.  (10/6/10 Trial Tr., at 20.)  His remarks were appropriate.

The prosecutor described N.M.'s memory as "awfully detailed" and "excellent," considering that the incident with her occurred seventeen years earlier.  The prosecutor

supported this argument by pointing out specific details that N.M. had remembered. *Id.*, at 20-21. These remarks also were appropriate, and because the prosecutor did not imply that he had special knowledge of facts about his witnesses, he did not engage in improper vouching. Defense counsel was not ineffective for failing to make a meritless objection to the remarks in question. *Conley v. Warden Chillicothe Corr. Inst.*, 505 F. App'x 501. 507-08 (6th Cir. 2012).

### iii. Facts not in Evidence

Petitioner's final argument about the prosecutor is that the prosecutor argued facts not in evidence to bolster the complainant's testimony. The prosecutor stated that the jury had not heard any evidence suggesting that an adult motivated the complainant to make false accusations. The prosecutor also stated that there was nothing in the movie "Lovely Bones" that would influence a five-year-old to make up a story about fellatio. (10/6/10 Trial Tr., at 23-25.) Finally, the prosecutor asked the rhetorical question, "[W]hat five year old would know how to make an accusation like this unless they'd been exposed [to a sex act like fellatio]?" *Id.*, at 24.

Although "[i]t is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial,' " they " 'must be given leeway to argue reasonable inferences from the evidence.' " *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (internal and end citations omitted). The disputed remarks and question cited in the previous paragraph were based on the testimony at trial or on reasonable inferences from the testimony. As such, they were proper, and defense counsel had no basis for objecting.

The prosecutor's remarks were proper for the most part, and even though the opening remarks about Petitioner seeing children differently and not being able to control his sexual urges was questionable, the remarks did not "infect[] the trial with [such] unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Therefore, defense counsel was not ineffective for failing to object to the remarks, and Petitioner has failed to show "cause" for his procedural default.

### 3. Miscarriage of Justice

Having determined that no cause exists, the Court need not decide whether Petitioner suffered any prejudice, and

> [t]he final inquiry is whether a miscarriage of justice would result through enforcement of the procedural default. A miscarriage of justice exists in the extraordinary case where the petitioner demonstrates his actual innocence.

*Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006).

"To be credible, [a claim of actual innocence] requires [a] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence . . . any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006).

There was substantial evidence of Petitioner's guilt at trial, and he has not presented the Court with any new and credible evidence of actual innocence. Therefore, a miscarriage of justice will not occur as a result of the Court's enforcement of the

procedural-default doctrine. His prosecutorial-misconduct claims are procedurally defaulted.

## D. Trial Counsel

Petitioner asserts that his trial attorney was ineffective for (1) eliciting bolstering hearsay testimony from the complainant's mother, (2) failing to object to the prosecutor's improper opening statement and closing argument, and (3) failing to request an instruction on "other acts" evidence. The Court has already determined that trial counsel was not ineffective for failing to object to the prosecutor's opening statement and closing argument. Thus, the only issues are whether trial counsel was ineffective for eliciting bolstering hearsay from a witness and for failing to request an instruction on the proper use of "other acts" evidence.

The Michigan Court of Appeals addressed Petitioner's claims on direct appeal and concluded that trial counsel was not ineffective. The Court of Appeals determined that trial counsel had engaged in reasonable trial strategy, that counsel's failure to object to the prosecutor's conduct did not impact the outcome of the trial, and that the failure to request a jury instruction on "other acts" evidence did not fall below an objective standard of reasonableness.

### 1. Clearly Established Federal Law

To prevail on his claim, Petitioner must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The deficient-performance prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "[T]he defendant

must show that counsel's representation fell below an objective standard of reasonableness.  *Id.*, at 688.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.,* at 687.  A defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*, at 694.

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Richter*, 562 U.S. at 105 (internal and end citations omitted).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.*

### 2.  Eliciting Hearsay

Petitioner claims that his trial attorney damaged the defense by eliciting hearsay from the complainant's mother.  Defense counsel asked the mother what the complainant's exact words were to her when they were watching the movie "Lovely Bones."  The mother responded that the complainant had said to her, "Sam put his private in my mouth."  (10/5/10 Trial Tr., at 119.)  Petitioner maintains that there is no hearsay exception for this prejudicial evidence and that it served to bolster the complainant's testimony.

The Michigan Court of Appeals concluded on review of this claim that it was not unreasonable to elicit the mother's testimony because defense counsel was attempting

to prove that after the mother heard her daughter's inflammatory statement, she was so enraged that she failed to reasonably investigate her daughter's claim. The Court of Appeals also pointed out that the statement merely reiterated an accusation which the jury heard from other sources. The complainant had already testified that she told her mother about Petitioner putting his penis in her mouth (10/5/10 Trial Tr., at 59), and the mother had already testified that the complainant told her something that made her cry and want to cut off Petitioner's penis. *Id.*, at 114. Therefore, even assuming that trial counsel performed deficiently by eliciting the mother's hearsay remark, the deficient performance did not prejudice the defense.

### 3. Failure to Request a Jury Instruction

Petitioner's final allegation about trial counsel is that counsel did not request a jury instruction on "other acts" evidence. Petitioner points out that the jury was never advised that the court admitted the evidence to show a scheme or plan under Michigan Rule of Evidence 404(b). The prosecutor, however, implicitly made that argument by pointing out similarities between the prior crime and the current case.

Furthermore, to his credit, trial counsel tried to prevent the prosecutor from admitting the "other acts" evidence in the first place, and after N.M. testified, he objected to the amount of detail that the prosecutor elicited from N.M. During closing arguments he pointed out that the incident with N.M. occurred seventeen years earlier, and he stated that he was not going to defend against a case that happened so long ago. He urged the jury to keep an open mind and not to let the prior incident distract them. (10/6/10 Trial Tr., at 32, 34.)

The trial court, moreover, charged the jurors not to let sympathy or prejudice influence their decision, *id.*, at 38, and, as the Michigan Court of Appeals pointed out, the "other acts" testimony was proper and admissible. In fact, a jury may consider a defendant's prior criminal sexual conduct with a minor "for its bearing on any matter to which it is relevant." Mich. Comp. Laws § 768.27a(1). There was no basis for limiting the "other acts" evidence, and defense counsel was not ineffective for failing to request a jury instruction on the evidence.

The Court concludes that trial counsel was not constitutionally ineffective and that the state appellate court's adjudication of Petitioner's claim was not objectively unreasonable. Petitioner is not entitled to relief on his claim about trial counsel.

## E. The Cumulative Effect of Errors

Petitioner contends that the cumulative effect of the trial errors deprived him of a fair trial and due process of law. The Michigan Court of Appeals disagreed with Petitioner and noted that it had rejected the majority of Petitioner's claims. The Court of Appeals then stated that, while it did conclude "that the trial court erred in admitting the film as evidence and that the prosecutor made one improper statement during his closing argument, [it could not] conclude that [Petitioner was] entitled to relief as a result of the cumulative effect of those two errors." *Rosier*, 2012 WL 516068, at *7. The Court of Appeals noted that "the evidence of [Petitioner's] guilt was substantial" and that "[t]he errors, even considered together, were not seriously prejudicial and did not deny [Petitioner] a fair trial." *Id.*

This Court rejects Petitioner's claim because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. Thus, it

cannot be said that the judgment of the [Michigan] courts is contrary to . . . any . . . Supreme Court decision so as to warrant relief under the AEDPA." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). In short, post-AEDPA, a claim that the cumulative effect of errors rendered a petitioner's trial fundamentally unfair is not cognizable on habeas corpus review. *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)).

## F.  The Sentence

Petitioner alleges that his sentence of life imprisonment without the possibility of parole is excessive and cruel and/or unusual punishment under the Michigan and Federal Constitutions. Specifically, Petitioner argues that:  (1) because his sentence was mandatory under state law, it did not allow the trial court to take into consideration whether the sentence fit the crime and the offender; (2) his sentence is disproportionately severe in comparison to sentences for other Michigan crimes that create a high risk of loss of life; (3) the sentence is inconsistent with penalties imposed in other jurisdictions; and (4) a life sentence implies that the offender is beyond rehabilitation and removes any opportunity for him to reform.

The States argues that this claim is procedurally defaulted. The Court agrees because:  (1) Petitioner did not object to his sentence on constitutional grounds at his sentencing; (2) the Michigan Court of Appeals enforced the contemporaneous-objection rule by addressing Petitioner's claim on direct appeal for "clear error affecting substantial rights;"[5] (3) the rule is firmly established and regularly followed; and (4)

_____

[5]  The Court of Appeals also reviewed each of the appropriate factors and concluded that Petitioner's sentence was not cruel or unusual given the gravity of the offense. The Court of Appeals also stated that the sentence was not disproportionate when

Petitioner has not alleged "cause" for his failure to object and resulting prejudice. Petitioner also has not shown that a miscarriage of justice will occur as a result of the Court's failure to address the merits of his claim. The Court concludes that Petitioner's challenge to his sentence is procedurally defaulted.

## G. Failure to Request a Bill of Particulars

Petitioner's next two claims allege that trial counsel was ineffective and deprived him of his constitutional rights to due process and a fair trial by failing to request a bill of particulars or move to suppress inadmissible evidence. Petitioner contends that the error deprived him of fair notice of the criminal charge and an opportunity to defend himself, because he did not know how the prosecutor intended to prosecute the case.

### 1. Michigan Court Rule 6.508(D)(3)

The State maintains that Petitioner's claims about trial counsel's failure to file a bill of particulars are procedurally defaulted. The procedural rule in question is Michigan Court Rule 6.508(D)(3), which states in relevant part:

> **(D) Entitlement to Relief.** The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion
>
> . . . .
>
> (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the

---

compared to the penalty imposed for other crimes in Michigan and when compared to the punishment for first-degree criminal sexual conduct in other jurisdictions. The Court of Appeals acknowledged that Petitioner's sentence precluded him from rehabilitating himself and from reentering society, but the court pointed out that Petitioner's behavior was evidence of escalation, not rehabilitation, and that the opportunity for rehabilitation was only one of the factors to be considered in evaluating the constitutionality of Petitioner's sentence. The court concluded that Petitioner's sentence was not cruel or unusual.

> conviction and sentence or in a prior motion under this
> subchapter, unless the defendant demonstrates
>
>> (a) good cause for failure to raise such grounds
>> on appeal or in the prior motion, and
>>
>> (b) actual prejudice from the alleged
>> irregularities that support the claim for relief.

Mich. Ct. R. 6.508(D)(3).

Petitioner violated this rule by not raising his claims about trial counsel and the lack of a bill of particulars on direct appeal when he had the opportunity to do so. Further, the last state court to issue a reasoned opinion on his claims was the Michigan Court of Appeals on state collateral review, and it denied leave to appeal because Petitioner could have raised his claim previously and failed to establish "good cause" under Rule 6.508(D)(3)(a) for his failure to do so. The procedural bar set forth in Rule 6.508(D) is an adequate and independent ground on which state courts may rely to foreclose review of federal claims. *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005). Therefore, the first three factors of the procedural-default doctrine are satisfied, and Petitioner must show cause for his procedural default and resulting prejudice.

## 2. Cause and Prejudice; Miscarriage of Justice

Petitioner alleges in his ninth and final claim that his appellate attorney was ineffective for failing to raise and preserve meritorious claims in the appeal of right. To prevail on a claim of ineffective assistance of appellate counsel, Petitioner must show (1) that his appellate attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) there is a reasonable probability he would have prevailed on appeal if his attorney had raised the issues. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Petitioner's underlying claims about trial counsel's failure to file a bill of particulars lack merit because Petitioner was given notice and an opportunity to defend against the criminal charge and the prosecutor's theory. The state trial court's docket indicates that Petitioner was arraigned on the charge in state district court on June 23, 2010, which was over three months before his trial. In addition, he was present at the preliminary examination where the complainant and her brother testified, *see* 7/1/10 Prelim. Examination Tr., at 3 (ECF No. 8-2), and over a month before trial, the prosecutor gave notice of his intent to introduce "other acts" evidence, *see* 8/25/10 Final Conference Tr., at 3-4 (ECF No. 8-4).

As for the disputed movie that was shown to the jurors, the prosecutor raised that issue before the trial commenced on October 4, 2010. When the prosecutor asked the trial court for permission to shown the movie to the jury, defense counsel responded that it was too early to address the issue and that he would prefer to cross that bridge when they got to it. The prosecutor and trial court agreed that a ruling on the issue could be postponed, because they anticipated that the movie would be shown on rebuttal if the defense turned out to be that the complainant fabricated her allegation based on something that she saw in the movie. (10/4/10 Trial Tr., at 15-17.)

Defense counsel objected to the movie on the following day after the movie was shown to the jury. Although he could have moved for a bill of particulars before then, the prosecutor argued that the movie was insignificant, and the trial court instructed the jury that the movie had absolutely no relationship to the charge against Petitioner. The trial court also stressed to the jury that the sole purpose of the movie was to provide the jury with an independent basis for determining whether the film influenced the

complainant or her mother to make their allegations against Petitioner. (10/6/10 Trial Tr., at 45.)

Given the trial court's jury instruction and the prosecutor's argument that the movie was insignificant, it is unlikely that the jury attached any particular importance to the movie. Therefore, defense counsel's failure to move for a bill of particulars regarding the content of the movie did not prejudice the defense.

Petitioner had sufficient notice of the charge and the prosecutor's theory. Consequently, his seventh and eighth claims about defense counsel not seeking a bill of particulars lack merit, and appellate counsel was not ineffective for failing to raise the issues on direct appeal.

Petitioner has failed to establish "cause" for his procedural default, and the Court need not determine whether he was prejudiced by the claimed errors. In addition, a miscarriage of justice will not result from the Court's enforcement of the procedural-default doctrine because Petitioner has not presented the court with any new and credible evidence of actual innocence. All four procedural-default factors are satisfied as to Petitioner's seventh and eighth claims.

## H. Appellate Counsel

Petitioner raises an independent claim about appellate counsel's failure to raise all his claims on direct review. But the only claims that appellate counsel did not raise on direct appeal were Petitioner's two claims about his trial attorney's failure to seek a bill of particulars. For the reasons given in the previous section of this opinion, there is not a reasonable probability that Petitioner would have prevailed on appeal had appellate counsel raised the issues. "[B]y definition, appellate counsel cannot be

ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

## IV. Conclusion

The Michigan Court of Appeals adjudicated most of Petitioner's claim on the merits, and, as to those claims, the state appellate court's decision was not contrary to Supreme Court precedent or an unreasonable application of Supreme Court precedent. The state appellate court's decision also did not constitute an unreasonable application of the facts, and it was not "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. As for the claims that the state court reviewed for "plain error" or because Petitioner failed to abide by Michigan Court Rule 6.508(D)(3), those claims are procedurally defaulted. Accordingly, the petition is denied.

## V. Denial of a Certificate of Appealability and Leave to Proceed *In Forma Pauperis* on Appeal

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327.

Reasonable jurists could not debate the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further. The Court, therefore, declines to issue a certificate of appealability. The Court declines to grant leave to proceed *in forma pauperis* status on appeal because an appeal could not be taken in good faith. 28 U.S.C. § 1915(a)(3). Petitioner may apply to the Court of Appeals for a certificate of appealability and for leave to proceed *in forma pauperis* on appeal.


                                              s/ Nancy G. Edmunds
                                              NANCY G. EDMUNDS
                                              UNITED STATES DISTRICT JUDGE

Dated: May 24, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 24, 2018, by electronic and/or ordinary mail.

                                              s/ Lisa Bartlett
                                              Case Manager